FILED
IN OPEN COURT

NOV 13 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL NO. 1:15-CR-307 |
| | ) | |
| JOHN BRYAN MCNAMARA, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt:

1. FK is a national of Pakistan who resides in Pakistan. At all times relevant to the allegations in the Criminal Information, FK was a dealer in artifacts who purchased, sold and exported artifacts from Pakistan to purchasers in the United States, including MCNAMARA, WMMP, Inc., Paleo Direct, Inc., and IK.

2. IK is the cousin of FK and a national of Pakistan who, since coming to the United States, has been a dealer in artifacts involved in purchasing, selling and importing artifacts from Pakistan to the United States. In October 2013, IK lived in New Mexico. IK previously lived in Arizona.

3. Defendant JOHN BRYAN MCNAMARA ("MCNAMARA") lives in Florida and has been in the business of buying, collecting, and selling fossils and artifacts for profit since at least 2000.

4. MCNAMARA has personally handled thousands of genuine metal artifacts as well as forgeries, and is able to identify authentic ancient metal objects, including items from the Iron, Bronze, and Neolithic Ages.

5. MCNAMARA also has personal experience and expertise in restoring and conserving ancient artifacts.

6. At all times relevant to the allegations in the Criminal Information, MCNAMARA owned and controlled WMMP, Inc. ("WMMP"), a Florida corporation that was created in or about 2009 and used by MCNAMARA to buy and sell [import two] fossils and artifacts.

7. A mailing address for WMMP is and was P.O. Box 2114, Umatilla, Florida, at which MCNAMARA has received shipments of artifacts and fossils, including artifacts purchased and shipped by FK and IK.

8. Paleo Direct, Inc. ("Paleo Direct") is a Florida corporation that was created in or about 2002. At all times relevant to the allegations in the Criminal Information, MCNAMARA owned and controlled Paleo Direct.

9. Paleo Direct buys and sells fossils and artifacts. Its website, www.paleodirect.com, provides information about the company and advertises items that are for sale.

10. As stated on Paleo Direct's website, MCNAMARA is familiar with U.S. domestic and foreign regulations and laws regarding the export, import and sale of artifacts/antiquities. MCNAMARA is personally involved in vetting the legality and authenticity of artifacts acquired and/or sold by Paleo Direct.

11. At all times relevant to the allegations in the Criminal Information, MCNAMARA's phone number was 407-902-4987 and one of his email addresses was worldmuseumofman@gmail.com.

12. MCNAMARA communicated with FK and IK by phone and by email. One email address that IK used was ijazcm122@yahoo.com. One email address that FK used was fahad_khan928@yahoo.com.

13. FK and IK knew that MCNAMARA was a dealer who was in the business of buying and selling artifacts, including artifacts located outside the United States that had to be imported into the United States.

14. Since at least 2007, MCNAMARA has purchased authentic artifacts from in or near present-day Pakistan from FK and also IK on multiple occasions. For example, some of the artifacts include bronze and iron axes, spears, arrowheads, swords, and daggers. At least some of these items were obtained by excavating human graves in or near present-day Pakistan.

15. Like other dealers in artifacts, FK would typically offer to sell MCNAMARA multiple items at one time, which were sometimes referred to as "lots."

16. After arranging to purchase items from FK, MCNAMARA would typically pay for the artifacts by electronically transmitting the funds from inside the United States to FK in Pakistan, often through Western Union.

17. FK would cause the export of artifacts from Pakistan to MCNAMARA in the United States and would prepare paperwork that accompanied the shipments. MCNAMARA sometimes advised FK on the preparation of such paperwork.

18. Since at least 2007, MCNAMARA has purchased authentic artifacts from in or near present-day Pakistan from IK on some occasions. These artifacts included ancient coins.

19. Throughout the conspiracy charged in the Criminal Information, MCNAMARA, IK and FK knew the following:

   a. Items that MCNAMARA purchased from IK and FK were from in or near present-day Pakistan and were being exported from Pakistan.

   b. The Government of Pakistan had laws governing the export of artifacts from Pakistan.

   c. The United States has and had regulations and laws governing the import of artifacts from foreign countries at all times relevant to the Criminal Information.

   d. Customhouses, including U.S. Customs and Border Protection, rely on the documentation accompanying a shipment, such as a waybill.

20. FK would sometimes combine artifacts purchased by multiple dealers, such as IK and MCNAMARA, in one shipment from Pakistan to the United States. The recipient of the shipment would then be responsible for sorting and sending the artifacts to the proper purchaser(s).

   a. For example, by agreement between FK, IK and MCNAMARA, MCNAMARA sometimes received shipments of artifacts from Pakistan sent by FK that included artifacts purchased by IK. MCNAMARA would send these items to IK using common carrier or U.S. mail, knowing that IK was a dealer in artifacts and intended to sell these items.

   b. By agreement between FK, IK and MCNAMARA, IK sometimes received shipments of artifacts from Pakistan sent by FK that included artifacts purchased by

MCNAMARA. IK would send these items to MCNAMARA using common carrier or U.S. mail, knowing that MCNAMARA was a dealer in artifacts and intended to sell those items.

21. MCNAMARA and IK would sometimes send money to FK in Pakistan via international wire from the United States, with the knowledge and intent that the money would be used to purchase artifacts for export to the United States.

22. In sending money to Pakistan for the purchase of artifacts, MCNAMARA and FK agreed to structure the electronic transmissions in order to avoid detection and scrutiny by law enforcement. For example, it was agreed that:

   a. MCNAMARA would not send international wires to Pakistan in amounts greater than $1,000 because of Western Union's currency transaction reporting policies.

   b. MCNAMARA would structure payments to FK in order to avoid currency transaction reporting requirements.

   c. MCNAMARA and IK would purposely send electronic wires to other people in Pakistan, such as IK's father and brother, with the understanding and intent that the money would be given to FK.

23. MCNAMARA, IK and FK agreed to package and ship artifacts from Pakistan to the United States in ways that were designed to minimize and avoid scrutiny from customhouses, including CBP. Some of the ways that MCNAMARA, IK and FK attempted to avoid scrutiny of imports of artifacts from Pakistan was by:

   a. Not shipping the artifacts by cargo service;

5

      b. Routing the shipments to avoid countries like Hong Kong or China, both of which had reputations for being countries of origin for the shipping of illegal artifacts;

      c. Using domestic shipping, including U.S. mail and common carriers, to distribute artifacts among dealers inside the United States.

24. MCNAMARA told FK that FK, MCNAMARA and IK needed to be careful about how artifacts were shipped from Pakistan to the United States, in order to avoid scrutiny from customhouses, including CBP.

25. At no time did MCNAMARA seek permission from the Government of Pakistan to export the artifacts he purchased from IK or FK.

26. The following overt acts were taken as part of and in furtherance of the conspiracy and scheme:

      a. On or about June 8, 2009, MCNAMARA emailed FK about purchasing artifacts found in a grave in or near present-day Pakistan.

      b. On or about July 28, 2010, MCNAMARA and FK discussed MCNAMARA purchasing artifacts, including maces and bronze axes, from IK.

      c. On or about March 7, 2013, MCNAMARA received a shipment of artifacts from Pakistan that were sent by FK. This shipment also included artifacts that IK had purchased from FK.

      d. On or about October 8, 2013, FK, IK and MCNAMARA caused an international shipment of artifacts ("October 2013 shipment"), shipped from Rawalpindi, Pakistan, to arrive at Washington Dulles International Airport in the Eastern District of Virginia, with the intention that the artifacts would be transported and sold within the United

6

States by IK, MCNAMARA and others.

e. On or about October 8, 2013, FK caused the presentation of a waybill to CBP that falsely described the contents of the October 2013 shipment as "decoration pieces."

f. After October 8, 2013, MCNAMARA, FK and IK agreed that IK would falsely say that the entire October 2013 shipment belonged to IK and that the Florida address was a mistake.

g. On or about October 23, 2013, MCNAMARA had his customs broker call CBP to inquire about the October 2013 shipment.

h. In or about November 2013, MCNAMARA provided advice and instructions to IK and FK about what IK should say to CBP regarding the October 2013 shipment.

i. On or about November 10, 2013, MCNAMARA, FK and IK agreed that they would provide documents and make representations to CBP consistent with the waybill accompanying the shipment, which described the artifacts as "decoration items," and intentionally not disclose that they were dealers in artifacts and the artifacts were being imported for the purpose and with the intent to sell them in the United States.

j. On or about November 21, 2013, FK and MCNAMARA discussed the creation of false and fraudulent document to substantiate IK's claims that the artifacts in the October 2013 shipment belonged to IK and their export was approved by the Government of Pakistan.

k. On or about December 3, 2013, IK sent false and fraudulent documents to CBP via facsimile, including what purported to be certificates issued by the Government of Pakistan regarding the October 2013 shipment.

7

l. On or about January 2, 2014, IK sent false and fraudulent documentation via U.S. mail to CBP, which purported to show that the Government of Pakistan had no objection to the export of the artifacts contained in the October 2013 shipment.

m. On or about April 3, 2014, MCNAMARA and FK agreed that MCNAMARA would tell any government employee, agent or official who asked about the October 2013 shipment that MCNAMARA had no connection with the shipment.

n. On or about April 23, 2014, IK, FK and MCNAMARA caused the submission of a petition to CBP that contained false and fraudulent information.

o. By May 2014, IK, FK and MCNAMARA had agreed to make false statements to any law enforcement or government employees, including those from CBP, who might ask questions about the October 2013 shipment.

p. On or about May 23, 2014, MCNAMARA emailed FK with an offer to purchase a "lot" of axes and maces for $4,000 and asked if the items would be sent to IK.

q. On or about September 6, 2014, FK told MCNAMARA to say that MCNAMARA had no connection with the October 2013 shipment.

r. On or about February 2, 2015, MCNAMARA when questioned concerning the October 2013 shipment, knowingly made false statements to federal law enforcement agents with the intent to obstruct, impair and impede any investigation regarding the October 2013 shipment. Specifically, MCNAMARA intentionally and knowingly told special agents from the U.S. Department of Homeland Security, Homeland Security Investigations the following information, which he knew to be false:

8

    i. He had not received anything from Pakistan for approximately three years and had not been expecting a shipment in October 2013.

    ii. MCNAMARA did not recognize IK's name, which was on the October 2013 shipment.

    iii. MCNAMARA did not know what was contained in the October 2013 shipment and did not want to deal with it.

27. The October 2013 shipment contained approximately 1350 artifacts, of the type that are typically found in ancient tombs that date from 6,000 years old to 500 years old.

28. Items in the October 2013 shipment were labeled based on the identity of the purchaser using labeling that was known and identifiable to IK, FK and MCNAMARA, but would not be readily identifiable or known to customhouses, including CBP. Specifically:

 a. Items purchased and belonging to MCNAMARA were labeled with "JH."

 b. Items purchased and belonging to IK were labeled "I."

 c. Items purchased and belonging to another person were labeled "A."

29. The petition submitted in April 2014 to CBP contained false and fraudulent information and statements. MCNAMARA agrees that the following information or statements were false or fraudulent::

 a. The petition included false and fraudulent certificates that purported to have been issued to IK by the Government of Pakistan.

 b. The petition falsely stated that the value of the shipment was unknown, but estimated to be only $500 U.S. dollars, when in fact IK, MCNAMARA and FK knew the value of the shipment was greater than $20,000 U.S. dollars.

    c. The petition falsely stated that all of the artifacts in the shipment had been gifted to IK and belonged to IK's father, when in fact they had been purchased by IK and MCNAMARA from FK.

    d. The petition falsely stated that the purpose and intended use of all of the artifacts in the shipment was to decorate IK's home in New Mexico, when in fact IK, MCNAMARA and FK knew that the IK and MCNAMARA intended to sell the artifacts for a profit.

    e. The petition falsely stated that all of the artifacts in the shipment belonged to IK, when in fact IK, MCNAMARA and FK knew that some of the artifacts had been purchased and belonged to MCNAMARA and others.

30. After the October 2013 shipment was seized, MCNAMARA, FK and IK agreed that they would not ship or import artifacts into the United States using cargo services, in an effort and attempt to avoid future seizures and scrutiny from customhouses, including CBP.

31. On January 6, 2014, MCNAMARA asked FK if FK could get MCNAMARA "papers" from the Government of Pakistan like the ones submitted by IK to CBP that would state that all artifacts that MCNAMARA purchased from FK were legal to export from Pakistan and import into the United States.

32. In furtherance of the conspiracy, MCNAMARA, FK, and IK have smuggled, clandestinely introduced, imported and brought artifacts into the United States from Pakistan, the value of which was more than $20,000.

33. MCNAMARA sold artifacts by and through Paleo Direct that were smuggled, clandestinely introduced, imported and brought into the United States from Pakistan.

34. The acts taken by the MCNAMARA, FK and IK in furtherance of the offense charged in the Criminal Information, as well as the acts described above, were done willfully and knowingly.

35. MCNAMARA, FK and IK were knowing participants in the conspiracy charged in the Criminal Information and actions discussed herein. At no time did FK or IK force MCNAMARA to participate. Rather, MCNAMARA participated freely and voluntarily.

36. MCNAMARA, FK and IK discussed and were aware of acts that they each took in furtherance of the conspiracy charged in the Criminal Information. One of the ways in which they communicated, coordinated and planned was by phone and email.

37. The defendant, JOHN BRYAN MCNAMARA, acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offense charged in this case.

                Respectfully submitted,

                Dana J. Boente
                United States Attorney

By: _____
      Katherine L. Wong
      Assistant United States Attorney
      Brian D. Harrison
      Special Assistant United States Attorney (LT)

After consulting with my attorneys and pursuant to the Plea Agreement I entered into with the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

                           10/30/2015
John Bryan McNamara
~~Defendant~~

I am John Bryan McNamara's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

                           11/3/15
David Smith, Esquire
Attorney for John Bryan McNamara