FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2016 JAN 21 P 1: 50

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CLERK US DISTRICT COURT |
| | : | **No. 1:15-CR-307**EXANDRIA, VIRGINIA |
| **v.** | : | |
| | : | **Judge Brinkema** |
| **JOHN BRYAN McNAMARA** | : | |
| | : | **Sentencing Date 1/29/16** |
| **Defendant.** | : | |

**\*\*\*\* *FILED UNDER SEAL* \*\*\*\***

**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant John B. McNamara, by counsel, files this sentencing memorandum to aid the Court in fashioning a legally correct and just sentence under 18 U.S.C. § 3553(a).

**I.    Introduction**

   **A.    Family Considerations**

   Mr. McNamara is a 51 year old U.S. citizen who lives in Longwood, Florida with his wife, Memnune, and their two daughters, SM15 (15 years old) and SM10 (10 years old). He is a devoted husband and father. Any term of incarceration beyond a one day period in the courthouse lock-up that may be necessary to make the sentence "legal" would impose a severe hardship on Mr. McNamara's family, especially on his daughter, SM15, whose chronic medical condition is life-threatening, as explained below and in the PSR, ¶51. Mr. McNamara is the sole breadwinner in his family. His wife, Memnune, "largely spends her time caring for their chronically ill

1

daughter, SM15. PSR, ¶50. Despite health insurance, for which the family pays $2,035 a month, PSR, ¶65, SM15's out of pocket medical expenses are high and unpredictable. PSR, ¶66. How could the family afford them if Mr. McNamara is incarcerated?

### B.   Cooperation

Another important consideration is Mr. McNamara's extensive cooperation with the government. On November 13, 2015, the day of his plea hearing, Mr. McNamara was debriefed for several hours by both prosecutors and two federal agents. The debriefing covered a variety of subjects of interest to the government, some of which had no connection with this case. He provided information about other online fossil and antiquities dealers, both here and abroad, who may be engaged in criminal activities, providing the government with a considerable number of leads. He truthfully discussed his relationship with the other conspirators in this case, F.K. and I.K. and a third person who had an interest in the package seized by CBP at Dulles Airport. I.K., who lives in the United States, may go to trial and, if so, Mr. McNamara will testify against him.  Mr. McNamara was tasked by the government with gathering and sorting a considerable quantity of documents, such as shipping records, Western Union payments to F.K. and emails with F.K. and I.K. This sentencing memo is being filed under seal to avoid disclosing Mr. McNamara's cooperation. The Court should not assume that the government will end up moving under Rule 35 to reduce Mr. McNamara's

sentence. Rather, the Court should give him credit for his coopera-tion now.

These and other § 3553(a) factors discussed below — including the unnecessarily high guidelines applicable to the instant offense and other probationary sentences in similar cases, discussed below in Point III.H — make Mr. McNamara's case an appropriate one for the imposition of a supervised probationary sentence with no jail time.

Such a sentence is warranted under the overarching "parsimony provision" of § 3553(a), which provides that a district court must impose sentences that are "sufficient, but not greater than neces-sary" to comply with the sentencing goals of the statute. *Kimbrough v. U.S.*, 552 U.S. 85, 101, 111, 128 S. Ct. 558, 570 (2007).

Counsel believes that a term of supervised probation combined with the substantial forfeiture penalty he agreed to, and the severe collateral consequences of his conviction (destroying his reputation and the good business he has built through many years of effort, PSR, ¶58), are sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for Mr. McNamara.[1] This type of sentence is consistent with many other probationary sentences imposed by other courts in this type of case, as we discuss below in Point III.H. It is also

---

[1]Unlike some of his business competitors, Mr. McNamara enjoyed an unblemished reputation in his fossil business. There was nothing negative about him online. He used his gem cutting skills to expertly prep fossils for resale. The quality and value of a fossil specimen depends in good part on how well it is "prepped."

consistent with the Justice Department's efforts to reduce prison
overcrowding and unnecessary periods of incarceration, discussed
below.

### C.  Current Prison Overcrowding

In January 2010, the BOP was operating at 36 percent over its
total rated capacity. U.S. Dep't of Justice, *Federal Prison System
FY 2011 Performance Budget*, at 7. "The system-wide crowding level
in BOP facilities is estimated to climb to 43 percent above rated
capacity by the end of FY 2011." *Id.*, at 3. Because of this
crowding, "as of May 2009, 18,630 (93 percent) of high security
inmates were double bunked, and 14,180 (26 percent) of medium
security inmates and almost 35,000 (81 percent) of low security
inmates were triple bunked." *Id.,* at 2. This state of affairs, with
more people going to prison and not getting the services they need
to reduce recidivism, "makes debilitation much more likely than
rehabilitation." *U.S. v. K,* 160 F. Supp.2d 421, 433-36 (E.D.N.Y.
2001).

Lanny A. Breuer, Assistant AG for the Criminal Division,
stated, in a report to Congress, that "the federal inmate popula-
tion has been increasing to unsustainable levels. As budgets have
tightened across all levels of government, the growing inmate popu-
lation has put enormous strain on correctional and other law
enforcement resources...Of particular concern, the burgeoning
federal prison population detracts from the ability of corrections
officials to safely manage federal prisons; it can also limit the

delivery of services aimed at minimizing recidivism." The Attorney
General's Sentencing and Corrections Working Group: A Progress
Report, 23 Fed. Sent. Reporter 110 (Dec. 1, 2010). Attorney General
Holder has been trying to reduce the federal prison population
which went down slightly in 2014-the first reduction in several
decades. In light of continuing prison overcrowding, and the
expense of mass incarceration, it makes sense to avoid incarcer-
ating persons who plainly do not need to be incarcerated.


## II.  Legal Standard

After *Gall v. United States*, the sentencing guidelines range
is truly advisory.  Rejecting the government's argument that sen-
tences significantly outside the advisory guidelines range should
be subjected to exacting scrutiny on appeal, the Supreme Court in
Gall stressed that "the Guidelines are only one of the factors to
consider when imposing sentence." 552 U.S. 38, 128 S. Ct. 586, 602
(2007).  As the Court explained, the advisory guidelines sentencing
range is only a "starting point and the initial benchmark" from
which sentencing courts should begin to make their sentencing
determinations. *Id.* at 596.  That is because, pursuant to *United
States v. Booker*, courts must consider the recommended guideline
range as one of seven co-equal statutory sentencing factors enumer-
ated in 18 U.S.C. §3553(a)(1)-(7).  *Booker*, 543 U.S. 220, 259-60
(2005). Those seven factors are the nature or the offense and the
characteristics of the defendant, the kinds of sentences available,

5

the guidelines, any pertinent policy statements, the need to avoid unwarranted sentencing disparities, and any need to provide restitution.

Upon consideration of those factors, a sentencing court may find that the case falls outside the "heartland" contemplated by the guidelines, or that "the guidelines sentence itself fails properly to reflect the § 3553(a) considerations," or that "the case warrants a different sentence regardless." *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 2465 (2007). While the District Court must begin its analysis by correctly calculation the advisory sentencing range, the sentencing court is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence. This is because, under *Rita*, a district court is free simply to disagree, based on the § 3553(a) sentencing factors, with the U.S.S.G.'s "rough approximation" of the appropriate sentence for any given case. *Id.* A sentencing court may vary from the Guidelines based on a categorical disagreement with a particular guideline that does not properly reflect the § 3553(a) factors, or it may vary because the individual characteristics of the case make the Guidelines range excessive. *Kimbrough*, 128 S. Ct. at 570, 576.

The primary directive of § 3553(a) is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Moreover, there is no presumption that the advisory Guidelines range is the minimally sufficient sentence that

§ 3553(a) requires the Court to impose. *Gall*, 128 S. Ct. at 596-97 (sentencing court "may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented."). "'It has been uniform and constant in the federal tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'..Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011)(quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). This tradition allows the sentencing court to conduct an inquiry broad in scope, largely unlimited either with respect to the kind of information the court may consider or the source from which it comes. *Pepper*, 131 S. Ct. at 1240.

In *Gall*, for example, the Court found that a sentence of probation was "reasonable" in a case in which the Guidelines called for a sentencing range of 30-37 months, and reversed the Court of Appeals for failing to "reflect the requisite deference" to the District Court's sentencing decision. *Id.* at 598. Indeed, whatever sentence the court imposes after appropriately considering all the statutory sentencing facts – "whether inside, just outside, or significantly outside the Guidelines range" – must be reviewed by a Court of Appeals under a "deferential abuse-of-discretion standard." *See Gall*, 128 S. Ct. at 591 (reversing Court of Appeals and

reinstating a probationary sentence where advisory sentencing range was 30-37 months).

In two summary reversals, the Supreme Court made clear that *the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence* based on consideration of the statutory sentencing factors. *Nelson v. U.S.,* 555 U.S. 350, 129 S. Ct. 890 (2009); *Spears v. U.S.,* 129 S. Ct. 840 (2009). These cases reiterate that sentencing courts may not presume that a sentence within the Guidelines is reasonable and that the Guidelines range may not be used as a default sentence to be imposed unless a basis exists to impose a sentence outside that range.

## III. Application of Sentencing Factors Under § 3553(a)

### A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

#### 1. Conspiracy to Receive "Cultural Heritage Resources" Under 18 U.S.C. §§ 371 and 545, and U.S.S.G. § 2B1.5

The offense conduct is described in ¶¶6-18 of the PSR. Unlike most of these cases, the foreign country (Pakistan) did not discover anything was amiss and complain to the United States about the loss of its "cultural heritage resources." The items Mr. McNamara was importing, which were of relatively little value, such as arrowheads, axes and spear tips, are plentiful and easy to dig up—many poor villagers make a living doing this — and they are sold

openly in Pakistan without hindrance from the law.[2] A country in dire economic condition and battling the Pakistani Taliban doesn't have the resources to enforce its patrimony law — to conserve its cultural patrimony in museums.    Counsel is unaware of any other cases involving Pakistani artifacts imported into the United States.

**B.    Specific Offense Characteristics**

        **1.    Increase if offense was committed for pecuniary gain (§ 2B1.5(b)(4))**

The total offense level in this case should not be increased by 2 on the ground that it was "committed for pecuniary gain or otherwise for a commercial purpose (Section 2B1.5(b)(4))." PSR, ¶26. Mr. McNamara contends that the items he imported from Pakistan were intended for a museum he was developing that would display historical and cultural artifacts from that area of the world.[3] The museum he was planning would not generate revenue. The only Pakistani artifacts he sold were ones that he determined to be of poor quality such that he could not use them for the museum. That is exactly what he told the investigators when interviewed on November 13, 2013, long before he had ever heard of the Guidelines.

---

    [2]Most of the imported items cannot even be positively identified as Pakistani in origin as opposed to Afghani or Iranian. See PSR, ¶¶11, 14.

    [3]The idea for the museum began in 2003. He had planned to open it in the building he now occupies in Umatilla, Florida, as the local government and chief of police would confirm. In the meantime, he had created a museum website which displayed many of the items he acquired from F.K. in Pakistan.

PSR, ¶9. These relatively small value items could only be purchased in large lots from F.K. Mr. McNamara didn't get to choose the specific items in the lots. He had to take the whole lot if he wanted it. He was stuck with the poor quality items in the lots unless he sold them. He estimates that he sold less than 50 of the thousands of individual items he bought from F.K. and most of those were not even of Pakistani origin. He made little profit on the items he sold as there is not much buyer interest in them. The vast majority of Mr. McNamara's profits came from his legitimate dealing in fossils which he expertly prepped, not artifacts, much less Pakistani ones.

### 2. Increase if offense involved funerary objects (§ 2B1.5(b)(3))

While this two-level enhancement *may* apply[4] it has not been proven that it does apply and that is the government's burden. But, in any event, this proposed enhancement is just another illustration of the absurdity of the Guidelines. The small objects Mr. McNamara imported from Pakistan for his museum (arrowheads, axes,

---

[4]We say "may" because there is not yet any evidence in the record showing that these objects fall within the strict definition of "Funerary object" in the Commentary's Application Notes. Note 4(D) defines "funerary object" to mean "an object that, as part of the death rite or ceremony of a culture, was placed intentionally, at the time of death or later, with or near human remains." Thus, we ask the Court not to apply this enhancement. Dr. Fredrik Hiebert concluded that "many of the artifacts likely originated from tombs in northern Afganistan/Afgan-Pakistani border that date from 6000 years ago to 500 years ago." PSR, ¶11. This statement leaves one in doubt as to whether *any* of the artifacts actually came from graves *in Pakistan*. Moreover, it does not address whether the artifacts were "part of the death rite or ceremony of a culture, [and were] placed intentionally...with or near human remains."

10

knives, spear heads) were things no one cared about.[5] They were not at all uncommon. But the alleged fact that they were likely dug up by others from ancient grave sites results in a two level enhancement. If Mr. McNamara had illegally imported the Mona Lisa or the Venus de Milo after they were stolen from the Louvre, he would not face this two level enhancement because they are not "funerary objects." This enhancement scheme does not make sense and the Court should not apply it in this case. Both of these proposed enhancements illustrate the wisdom of Justice Breyer's 1999 warning that "[t]here is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finely among similar offenders. And there is much to be lost, both in terms of Guideline workability and even in terms of fairness." Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent'g Rep. 180, 1999 WL 730985, at *11 (1999). The Commission itself has recognized this problem of "factor creep."

---

[5]Mr. McNamara thought he would help to preserve these items in his planned museum for scientific study. Pakistan's government does not have the resources or capacity to collect these artifacts and display them in museums. The presence of the Taliban and other terrorist groups in the areas where the artifacts come from also prevents foreign archeologists from doing the work. *See Pakistan's Turmoil Endangers Its Archaeological Treasures*, Time Magazine (Dec. 25, 2009) (attached as Exh. 4).

**C.   The Guideline Range Provides No Useful Advice
Because it is not Based on Empirical Evidence or
National Experience and Fails to Promote Any
Purpose of Sentencing**

In *Rita v. United States*, 551 U.S. 338 (2007), the Court gave two reasons why it may be "fair to assume" the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors and experts. *Id.* at 348-50. However, the Court recognized that no all guidelines were developed in this manner. *Gall*, 552 U.S. at 46 & n.2; *Kimbrough*, 552 U.S. at 96. When a guideline does not "exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." 552 U.S. at 109-10.

The fraud and theft loss table that drives the guideline range in this case is not based on empirical data of past practice or on national experience since 1987. Because the Commission thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *Spears*, 129 S.

12

Ct. at 843; *Kimbrough*, 552 U.S. at 109-10; *Rita*, 551 U.S. at 351, 357.

When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior practice" with respect to white collar offenses. Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22-23 (1988). Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Starting just two years after the Guidelines went into effect, prison sentences for fraud offenses were steadily increased in 1989, 2001 and 2003 for loss and for the number of victims. Commentators, including high level Commission staff, attributed this steady ratcheting up of fraud sentences to political pressure and "signals" from Congress and the Justice Department. *E.g.,* Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 404, 411-34 (2004).

The 2001 increase was actually designed to bring fraud sentences into line with our overly punitive drug sentences. The drug guidelines themselves were not based on empirical data or national experience; they were designed to be "proportional" to statutory mandatory minimums. The feedback from judges, the institutional actors best suited to make sentencing recommendations, did not support any increase in the fraud guideline ranges. The 1989 and 2001 increases led to the absurd result that first time, non-violent fraud offenders were subject to guideline ranges as high as

13

those imposed on armed drug traffickers and even higher than those applicable to most violent offenders. Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense.[6] Many courts have imposed non-guideline sentences in fraud cases where there are real, individual victims who have suffered quantifiable losses(unlike in this case), finding that the Guidelines' emphasis on the sheer amount of the loss does not necessarily correlate with the level of culpability. *E.g., U.S. v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) (affirming 84 month downward variance because amount of loss was unfair proxy for culpability); *U.S. v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place...on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor").

---

[6]In the case of Mr. McNamara it is impossible to determine the amount of any "loss" to Pakistan (see PSR, ¶19), yet the applicable guideline, 2B1.5, makes the fraud/theft loss table the controlling factor in calculating the guideline range. The guideline arbitrarily substitutes the "value of the cultural heritage resource" for the concept of "loss" and then uses the fraud loss table to determine the offense level. Realistically, Pakistan suffered no loss whatsoever from the removal of these common artifacts and Mr. McNamara's action in importing them should not be compared to fraud or theft causing actual losses to individuals.

**D.  Widespread Disagreement with the Fraud Guideline is Further Evidence that it is Unsound**

In fiscal year 2012, sentences below the guideline range were imposed in 47.5% of all fraud cases. U.S. Sent'g Comm'n, *2012 Sourcebook of Federal Sentencing Statistics*, tbl.27. "[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance." *U.S. v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008). *See also U.S. v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) (The "Guidelines were of no help."); Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008) ("Since *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high.").

**E.  Kinds of Sentences Available: 28 U.S.C. § 994(j)**

The Court must now consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence...established [by] the guidelines zones recommend only a prison term. *Gall*, 552 U.S. at 59 & n.11.

Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j).  Congress issued

this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of non-violent and nonserious offenders, the interests of society at a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." See Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Far from following this directive, the Commission did just the opposite and, essentially for political reasons having nothing to do with justice or crime control, made sentences for nonviolent and nonserious offenses more and more severe over the years. Fortunately, this Court is now free to reject the Commission's much criticized, shoddy work product. How sad it is that good prosecutors are still required, even under the Obama Administration, to advocate for a sentence within these arbitrary guideline ranges in every case without any individualized consideration of the defendant as a person with a family. That policy is in obvious conflict with the Department's efforts to reduce unnecessary imprisonment, discussed above in Part I.B.

**F.    History and Characteristics of the Defendant**

Mr. McNamara's history and characteristics are discussed in Part I of this memo and in the PSR at ¶¶36-62. He has a Criminal

History Category of I, based on a criminal history score of zero. PSR, ¶38.

The family letters submitted to the Court — as well as the PSR — show that Mr. McNamara is basically a law-abiding and honorable citizen, and a dear husband and loving father of two girls who need him as the sole breadwinner of a family that has had more than its share of tragedy and hardship. The December 10, 2015 letter from Memnune McNamara and the letters from daughters SM15 and SM10 say it all. Exhibits 1-3. They capture Mr. McNamara's good character and how much he means to each member of his family. SM15's letter also recounts her serious and chronic medical problems, which began at age 7 (Exh. 2). She explains how her stage three Hodgkin's Lymphona developed, ironically, as a result of eight years of intravenous treatment of her JRA with the drug Remicade.[7] She mentions the fact that she went blind in her left eye because of her JRA. She only recovered her vision in that eye through surgery. She does not mention that her father is the one who drives her long distances to Gainesville, Miami and Palm Beach for her eye, cancer and juvenile rheumatoid arthritis (JRA) treatments and monitoring. PSR, ¶3 (travel permission granted by the Court).

---

[7]SM15's brave struggle with her chronic medical problems was recounted by the *Orlando Sentinel*. There is a video form of the print article at https://www.youtube.com/watch?v=JhKJzDxqNUo. See also a video recounting how she inspired her water polo team in a game four days after undergoing chemotherapy, https://www.youtube.com/watch?v=m-coV2HZyrU.

The letter from Mr. McNamara's wife (Exh.1) explains that when her daughter was forced to stop her Remicade treatment, the JRA disease "spread to many new areas of her body not formerly affected. We had to start treatment [with Remicade] again (which was the initial cause of the cancer) and now we live with even greater unknowns waiting for us. If John and I did not have true love for each other, a love we treasure each day despite so many hardships, we would surely have grown apart and...further devastated our children. Instead, it has brought us closer together." Mrs. McNamara writes that her husband's "role in my life is such that I would not want to have any part of my time here on Earth without him."

### G. The Advisory Guidelines Range

The Guideline range is calculated by Probation at 18 to 24 months based on a total offense level of 15 and a Criminal History Category I. The Guideline provision for supervised release is 1 to 3 years. PSR, ¶¶68-69. Mr. McNamara disputes that either of the two level enhancements discussed above should be applied. Therefore, he contends that the total offense level should be 11, not 15, and the guideline range should be only 8-14 months.

### H. The Need to Avoid Unwarranted Disparities in Sentencing

There are no co-defendants in this case.

However, a probationary sentence is necessary in order to avoid disparities with similarly situated defendants in other federal cases convicted of the same type of offense.

For the reasons explained at length above, courts have concluded that the fraud guideline in general is too severe; and in this type of "cultural heritage" case, in particular, they impose probationary sentences far below the applicable guideline range.

Attached to this memo as Exhibits 5-7 are news stories about three such "cultural heritage" cases, all of which involve much more serious conduct than in Mr. McNamara's case. Two of the cases involved co-conspirators engaged in smuggling multiple dinosaur fossils from China worth $570,000[8] and the third case involved smuggling large numbers of fossilized dinosaur eggs found in Eastern China.[9] Unlike Mr. McNamara, these three defendants were motivated purely by greed. All three of them received one or two year terms of straight probation with no jail time. Each attached news story is followed by the judgment of conviction pertaining to that case.

---

[8]John ("Rick") Rolater received two years of supervised probation and a $25,000 fine; Charles Magovern received one year of supervised probation and no fine from a different federal judge in Wyoming.

[9]Australian mineral dealer Tamas Kapitany was sentenced in the Central District of California to one year of supervised probation and a $20,000 fine. Federal agents seized more than 140 boxes of smuggled fossilized eggs from a warehouse in El Cajon. He had been smuggling dinosaur eggs from China into San Diego and Los Angeles since 1999 by mislabeling them as minerals or geological specimens and concealing the country of origin.

## I.   The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, To Accomplish Specific and General Deterrence, and to Provide Educational, Vocational, or Correctional Treatment

As explained in Part I above, a straight probationary sentence combined with the substantial criminal forfeiture penalty and the collateral consequences of his conviction, are sufficient to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, particularly in view of the severe hardships that would be suffered by his wife and children if he is incarcerated. No specific deterrence is needed in this case as Mr. McNamara is most unlikely to offend again. As noted in the PSR, ¶60, this frightening brush with the law has persuaded Mr. McNamara that he should retire from his current occupation and go back to work as a simple gemstone cutter, a skill he learned as a young man. He will make less money but will have much less anxiety.

Mr. McNamara also requests that the Court allow him to remain at large until he is required to voluntarily surrender for service of any term of incarceration or community confinement the Court might impose. The PSR, ¶4, relates that he "has remained in full compliance with all of the conditions of his release." He also requests that the Court order the return of his passport, which is now in possession of the Probation Office. PSR,¶4.

Respectfully submitted,

David B. Smith
VA Bar No. 25930
Smith & Zimmerman, PLLC
108 North Alfred Street,
Alexandria, Virginia  22314
(703) 548-8911
Facsimile (703) 548-8935
dsmith@smithzimmerman.com
*Counsel for John McNamara*

21

## Certificate of Service

I hereby certify that on the 21st day of January, 2016, I emailed the foregoing sentencing memorandum with exhibits to the following counsel of record:

SAUSA Brian D. Harrison
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia  22314
Brian.Harrison@usdoj.gov

AUSA Katherine L. Wong
U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia  22314
Katherine.L.Wong@usdoj.gov

Ms. Nina Blanchard
Senior U.S. Probation Officer
401 Courthouse Square, 3rd Floor
Alexandria, Virginia  22314
Nina _ Blanchard@vaep.uscourts.gov

David B. Smith
VA Bar No. 25930
Smith & Zimmerman, PLLC
108 North Alfred Street,
Alexandria, Virginia  22314
(703) 548-8911
Facsimile (703) 548-8935
dsmith@smithzimmerman.com
*Counsel for John McNamara*

# EXHIBIT
# 1

12/10/2015

Your Honor,

I met my husband John McNamara almost twenty years ago and it was a true love story you would only see in the movies. Being thirty years old and experienced enough with any type of personalities in private and business life then, John was an extraordinary person to meet with at first and after of course still to this day, after twenty years he is my everything, he is my prince, he is my only one. We have had hardships in life but we were confident we would get through anything as long as we had each other. That understanding is true today and it will never diminish later in our life

Our life was changed when our daughter Saoirse was diagnosed with her Juvenile Rheumatoid Arthritis 8 years ago. That brought different challenges, struggles and a completely new routine with untold stress and worries to our life yet, we endured. Early this year, when we found out about Saoirse's cancer, we were devastated beyond words but we had to be strong for BOTH our daughters without hesitation, in order to keep Saoirse strong. After her cancer went into remission, her JRA disease spread to many new areas of her body not formerly affected. We had to start treatment again (which was the initial cause of the cancer) and now we live with even greater unknowns waiting for us. If John and I did not have true love for each other, a love we treasure each day despite so many hardship, we would surely have grown apart and the result, further devastated our children. Instead, it has brought us all closer together. We live very simple and humble by cherishing more meaningful values of life. We try to raise our children with these values as part of their fundamentals of life. John has been key to raising our children to have a sense in their life of what is truly important with goals and achievements.

John plays an important role in Saoirse's and Shylah's life not only as a parent and mentor, but as a most cherished part of their life each day. His role in my life is such that I would not want to have any part of my time here on Earth without him. To all of us, we would not be complete without him. His manner in life, his dignity, his ethics and his loyalty are just very few characteristic parts of who John is. He is the balance of our life. What happened related to his case is not native to who John really is. It was a result of a complete error in his judgment and he deserves a second chance with your consideration Your Honor.

Sincerely,

Memnune McNamara

# EXHIBIT
# 2

(COPY)

Your Honor,

If there is anyone who has given significant meaning to my life it would be my dad. He has always been there for me, through thick and thin. From bathing me as a baby to teaching me how to ride a bike and for taking me to my numerous doctor appointments and so much more, he has not once ever ceased to amaze me at the astounding job he has done as a dad. I have always been so close to him, I never want to be known as those daughters who think it's not "cool" to hang out their dads and just spend quality time with him. In fact, being able to spend one on one time with my dad is so rare and precious because there is so much that's unknown about my health as I've been in pain more and more each and every day. I see it as a gift to be able to be with him; I'm filled with gratitude because I know that some children may not have a mom or dad or even both. If you personally really knew my dad, he would be one of the most impacting and substantial persons you have ever encountered. I love him so much that even when he leaves for a weekend to visit his parents in Pennsylvania, I can't wait to see him again. Just those two or three days he's gone I become sorrowful because I look forward to coming home from school and telling him how my day went and just talking to him in general and I love those scratchy kisses he gives me from his beard. If my dad were to be gone for any longer than those three days he leaves it would be unbearable. Knowing that he is gone not to visit his parents and where I can't come home to and see him there and I can't give him those tight hugs and smell his cologne on his soft shirt, makes me come to tears to just think of it. As you may know a sliver of my background medically, I have been diagnosed with JRA (juvenile rheumatoid arthritis) since I was seven years old. I have had so many doctor appointments as well as surgeries for my eye because my JRA really affected my left eye to where I almost became blind. Then earlier this year, from the treatment I have gotten for eight years which is Remicade (an intravenous medicine), the medicine caused my body's immune system to have two tumors, one above my heart and the other next to my stomach. I was diagnosed with stage three Hodgkin's Lymphoma which is a cancer that's part of the immune system called the lymphatic system. This was the beginning to an inconsolable year. I fought hard and finally beat the cancer and am now in remission, but there's absolutely no way I wouldn't have been able to do it without my dad. Every time I would cry from the excruciating pain I was in or be crying because my hair was slowly falling out and it would occur to me that I was sick he would come to my bedside and hold me and tell me everything is going to be okay. And it always is with him, my whole life he has made everything better. Little scratches from falling off my bike when I was younger or from pain of a surgery I had or just me being gloomy that day, a hug or kiss from him would always and will always enlighten my mood. I just want you to take into consideration that my dad is not the kind of person who deserves what has been given to him from this occurrence.

Sincerely,

Saoirse McNamara

# EXHIBIT 3

Your Honor,

When I think of my daddy, I think of a person that takes a special place in my heart. He adds joy to my days. He has me smile everyday. He is always there for me, arms open wide, ready for me to jump into. I remember when my daddy and I went to the playground. I was trying to cross the monkey-bars, while my daddy stood next to me cheering me on. "Never give up!" he said to me, putting his arms under me in case I fell. With my daddy's help I did it. After that day on, I would recall that memory and smile. Without my daddy, parts of my life would be blank. I would not be the person I am.

Your Honor, please try to see my daddy through my eyes when it is time for you to decide for his case.

Sincerely,
Shylah Mcnamara

# EXHIBIT
# 4

**ME** Subscribe to TIME Magazine today! Sign In    Subscribe

$35.99

# Pakistan's Turmoil Endangers Its Archaeological Treasures

By Christopher Allbritton / Islamabad    Friday, Dec. 25, 2009

Like [ 0 ]    Tweet    G+1 [ 0 ]    Share    Read Later

In the mountains and valleys of Pakistan's Northwest Frontier Province, palace ruins and crumbling Buddhist monasteries dot the hills above war-torn locations such as Mingora, Peshawar and the Swat Valley. These magnificent ruins are all that's left of the Gandhara kingdom, which flourished from the 6th century B.C. to the 11th century A.D. It vanished under the pressure of war and conquest, re-emerging only in 1848 when relics and ruins were re-discovered by the British archaeologist, Sir Alexander Cunningham.



John Moore / Getty

An ancient Buddha carved into into a mountainside in the Swat Valley has been defaced after Islamic extremists attacked the historic relic at Jehanabad.

Now, Gandhara is in danger of vanishing a second time from the same old threats. Just as the Afghan Taliban destroyed the 1,500-year-old statues of the Buddha in Bamiyan, Afghanistan in 2001, militants in Pakistan have attacked the Buddhist heritage in Pakistan, driving away foreign research teams and tourists, forcing the closure of museums and threatening the integrity of valuable digs. "Militants are the enemies of culture," says Abdul Nasir Khan, curator of the museum at Taxila, one of the country's premier archaeological sites and a former capital of the Gandhara civilization. "It is very clear that if the situation carries on like this, it will destroy our cultural heritage."

**RELATED**

Pakistan's Vulnerable North-West Passage

Email    Print

Share    Reprints

Follow @TIME

(See pictures of Pakistan's vulnerable North-West Frontier Province.)

The Gandhara kingdom and its art are important because it shows the impact of Hellenistic influence brought by Alexander the Great and his Macedonians. Likewise Gandharan Buddhist art reached as far as China, Korea, and Japan. After it became part of the pre-Islamic Persian Empire, Gandhara's culture went on to influence artistic developments in the Middle East. Peshawar, Swat and much of northern Pakistan lay astride a portion of the old Silk Road, the ancient highway that transported riches between the east and west. Indeed, the Jehanabad Buddha looks out over a stretch of the old path. Later, in the 7th century, Swat Valley was the birthplace of Tantric Buddhism, and Chinese pilgrim Xuanzang described the valley as home to hundreds of Buddhist sculptures, monasteries and stupas. Only a fraction has been excavated so far.

Taxila should be a showcase of that civilization. Today a town about 20 miles northwest of Islamabad, it was a center of Buddhist learning, a must-visit for travelers like Xuanzang seeking Buddhist scripture and wisdom. Formerly part of the Persian Empire, Taxila was one of Alexander's conquests and is today a World Heritage Site. The museum there, started in 1918, is one of Pakistan's finest, with more than 4,000 artifacts from the Gandhara civilization. But no one comes to visit much anymore. Nasir Khan says there have been warnings of a possible attack on the museum, and some security procedures have been put in place, but he said they're insufficient.

(See pictures of Pakistan subcultures.)

The anxiety is palpable. In the last five days alone, Taliban militants have killed more than 100 people in near-daily bombings across the country in Peshawar, Rawalpindi, Lahore and now Multan. Foreign archaeological teams are being told not to come, warnings issued by their own governments or their institutions because of fear for safety. Local diggers can't get out to crumbling sites for security reasons as well.



AN ICON JUST GOT LARGER

THE NAVITIMER 46 mm

BREITLING
INSTRUMENTS FOR PROFESSIONALS™



CODE RED_

How a team of unknown coders and troubleshooters came together to save HealthCare.gov

READ THE STORY

**Sponsored Links**

**Social Security Sucks**
Born before 1969? You can get an extra $4,098 monthly with this
palmbeachgroup.com

**Buddha Statue**
Buddha Statue At Bargain Prices Available at BestDiscounts Now!
bestdiscounts.us/Bargains

**Best Knee Routine for 55+**
Doctors reveal the secret to better knees & joints - Do this daily!
www.instaflex.com/advanced

The lack of archaeologists at many sites has led militants and vandals to close in. Kashmir Smast, about 70 miles northwest of Islamabad, is a Hindu site, not Buddhist, and thus unusual for the area. "But there's no preservation, no one to look after the site," says Dr. Nasim Khan, professor of archaeology at the University of Peshawar. "The local people are damaging the site because of illegal diggings." In Swat, the Taliban have long attempted to destroy the Buddhist heritage of the region. In October 2007, as militants cemented their hold on the former tourist area, the Taliban dynamited the face of the Jehanabad Buddha into oblivion. The 23-foot-high carving of the seated Buddha, dating from the 7th century, is regarded as the second most important Gandhara monument after the Taliban-eradicated Bamiyan Buddhas.

**(See pictures of the battle against the Taliban.)**

Dr. Fazal Dad Kakar, the director general of the Department of Archaeology and Museums, played down the damage done to the carving as the work of local villagers, not Taliban. Regardless, it shows that even without a direct threat from Islamic militants, the lack of security means important sites are unprotected and ill-preserved and can fall prey to vandalism and looting.

Robert Knox, who was Keeper of the Department of Asia at the British Museum until 2006, gave up on coming to Pakistan in 2001 after 9/11. He was working in Bannu agency on the border of Waziristan. Today's it's an active war zone. "We were in Bannu for a very, very long time," says Knox, who excavated there from the mid-1970s to 2001. "We scratched the surface. There's still an enormous amount to do and sites are lost more or less daily. It's almost a free-for-all, particularly in difficult war-like areas."

Foreign teams bring a lot of money for conservation and excavating, money the cash-strapped Pakistani government doesn't have to spend on preserving antiquities when it has a war to fight. The University of Peshawar's Khan says that there are usually excavations on the outskirts of Peshawar and Taxila, but even he can't go to these sites anymore, much less foreigners. To his knowledge, he said, there are no foreign teams scheduled to come to Pakistan. "We are not taking the risks to bring them to the sites," he says. "We need their help, we need to involve them. But unfortunately, that's not been happening for the last two years."

Foreign contracts also often include a commitment to help preserve and develop a site after the initial research is done. Without that, excavations are being started and then left open when local funding dries up, Khan says. "We don't have the resources to protect each and every site in Gandhara," he explains. "We don't have any resources to make it a model site for tourism, which would create jobs and bring in money."

Speaking from his home in London, Knox says that it would be catastrophic to lose Gandhara and other ancient civilizations that sprung up along the Indus Valley to direct threats from militants or neglect caused by the security vacuum. "Journalists can't even go there, quite apart from people who want to do field archaeology," he says of the sites near Waziristan and other war-ravaged locations. "I don't think I shall ever see those places again."

See 25 people who mattered in 2009.

See the best pictures of 2009.

---

**WE RECOMMEND**

· 3 Ways Bonds Can Be Riskier Than You Think

· 10 Things You Never Knew About David Bowie

· See the Bernie Sanders Side Eye That Won the Debate

· Review: Ricky Gervais Presides Over a Dire Golden Globes Ceremony

· Sean Penn Has a 'Terrible Regret' About His 'El Chapo' Article

**ELSEWHERE ON THE WEB**

· Ever look yourself up? This new site is addicting. If you enter your name on this site, the results will surprise you. *(Instant Checkmate)*

· Obama Signs Law Banning $11bn in Social Security Benefits *(Money Morning)*

· 21 Great Novels Worth Finding the Time to Read *(AARP)*

· 80% Market Collapse in 2016 *(The Sovereign Investor)*

· Some children like to distance themselves from their parents. Others, like this daughter, do the opposite. *(Gillette on YouTube)*

Recommended by

# EXHIBIT 5

# Confessed fossil smuggler Rick Rolater sentenced to probation

BEN NEARY Associated Press
3:05 PM, Mar 25, 2014

fossil | skull | china | smuggle | bataar



U.S. Immigration and Customs Enforcement

U.S. Immigration and Customs Enforcement

HIDE CAPTION

CHEYENNE, Wyo. - A federal judge has sentenced a Colorado man to two years of supervised probation following his guilty plea to a federal felony charge of conspiring to smuggle fossils from China into the United States.

Judge Scott Skavdahl on Tuesday also ordered Rick Rolater of Eagle, Colo., to pay a $25,000 fine.

Rolater had sold fossils through two galleries, one in Jackson and one in Avon, Colo. He agreed to forfeit fossils to the government, including a Tyrannosaurus skull that authorities have said likely will be returned to Mongolia.

Rolater apologized to Skavdahl. The judge warned Rolater he would face jail if he violates probation.

The federal government last year returned another 70-million-year-old Tyrannosaurus skeleton to the Mongolian government that had been smuggled into the country by another fossil dealer.

Copyright 2014 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2014 MAR 31  AM 9 59

STEPHAN HARRIS, CLERK
CASPER

# United States District Court
## For The District of Wyoming

UNITED STATES OF AMERICA,

vs.

**JOHN RICHARD ROLATER**
a/k/a Rick Rolater

**JUDGMENT IN A CRIMINAL CASE**

CASE NUMBER: 13-CR-299-1S

Patrick J. Crank
Defendant's Attorney

THE DEFENDANT having pled <u>guilty to Count 1 of the Information</u> filed in this matter.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number |
|---|---|---|---|
| 18 U.S.C. §§ 371 and 545 | Conspiracy to Smuggle Goods into the United States | 05/17/2012 | 1 |

The defendant is sentenced as provided in pages 2 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within thirty (30) days of any change of residence or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

**Defendant's USM No: 13615-091**

March 25, 2014
Date of Imposition of Sentence

Scott W. Skavdahl,
United States District Judge

3/31/14
Date

DEFENDANT: John Richard Rolater a/k/a Rick Rolater                    Judgment-Page <u>2</u> of <u>6</u>
CASE NUMBER: 13-CR-299-1S

# PROBATION

The defendant is hereby placed on probation for a term of two (2) years.

While on probation, the defendant shall not commit another Federal, state, or local crime.

While on probation, the defendant shall not illegally possess a controlled substance. Revocation of probation is mandatory for possession of a controlled substance. The Court finds that the defendant has a low probability of illegal drug use, and mandatory drug testing is waived.

Pursuant to Public Law 108-405, Revised DNA Collection Requirements Under the Justice for All Act of 2004, the defendant shall submit to DNA collection while incarcerated in the Bureau of Prisons, or at the direction of the U.S. Probation Office.

While on probation, the defendant shall not use or possess a firearm, ammunition, dangerous weapons or destructive device. Probation shall be revoked for possession of a firearm.

The defendant shall make special assessment and restitution payments as ordered by the Court and is required to notify the Court, through the Probation Office, of any material change in the defendant's economic circumstances that might affect the defendant's ability to meet these monetary obligations.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth on the following page). The defendant shall also comply with the following additional conditions:

The defendant shall provide full financial disclosure to the U.S. Probation Officer, including detailed documentation of income and expenses.

The defendant shall cooperate with the Internal Revenue Service and file tax returns timely and lawfully, and pay any back taxes, penalties and interest as determined by the Internal Revenue Service.

Any employment shall be subject to the prior approval of the U.S. Probation Officer.

The defendant shall submit his person, residence, storage facility, office or vehicle to a search, conducted by a U.S. Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

DEFENDANT: John Richard Rolater a/k/a Rick Rolater      Judgment-Page 3 of 6
CASE NUMBER: 13-CR-299-1S

The defendant shall participate in a cognitive-behavioral treatment regimen that may include, but is not limited to, Moral Reconation Therapy, Cognitive Thinking, Thinking for a Change, or Interactive Journaling. He shall actively participate in treatment until successfully discharged or until the U.S. Probation Officer has excused the defendant from the treatment regimen.

The defendant shall execute any documents to facilitate the forfeiture and/or return of the items to the proper authorities or sovereigns.

DEFENDANT: John Richard Rolater a/k/a Rick Rolater
CASE NUMBER: 13-CR-299-1S

Judgment-Page <u>4</u> of <u>6</u>

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the Court or probation officer;

2) the defendant shall report to the probation officer in a manner and frequency directed by the Court or probation officer;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;

6) the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court;

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT: John Richard Rolater a/k/a Rick Rolater          Judgment-Page 5 of 6
CASE NUMBER: 13-CR-299-1S

## FINANCIAL PENALTIES

The defendant shall pay the following total financial penalties in accordance with the schedule of payments set out below.

| Count | Assessment | Restitution | Fine |
|-------|-----------|-------------|------|
| 1 | $100.00 | $0.00 | $25,000.00 |
| **Totals:** | $100.00 | $0.00 | $25,000.00 |

## FINE AND/OR RESTITUTION

The fine and/or restitution includes any costs of incarceration and/or supervision. The fine, which is due immediately, is inclusive of all penalties and interest, if applicable.

The defendant shall pay interest on any fine and/or restitution of more than Two Thousand Five Hundred Dollars ($2,500.00), unless the fine and/or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the below payment options are subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

The defendant acknowledges that he has ownership and the authority thereby to relinquish the fossils identified by the Government. All shareholders who have an interest in these fossils are aware of this situation and agree to relinquish the fossils. All fossils seized or forfeited by the defendant will be returned to their country of origin.

DEFENDANT: John Richard Rolater a/k/a Rick Rolater
CASE NUMBER: 13-CR-299-1S

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

The total fine and other monetary penalties shall be due as follows:

> In full immediately. Any balance not paid immediately shall be paid within ninety (90) days from today's date or entry upon judgment in this matter. Payments for monetary obligations shall be made payable by cashier's check or money order to the Clerk, U.S. District Court, 2120 Capitol Avenue, Room 2131, Cheyenne, WY 82001, and shall reference the defendant's case number, 13-CR-299-1S.

All financial penalty payments are to be made to the Clerks Office, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program.

# EXHIBIT
# 6



EDITION:

**U.S.**

Search Reuters

- <u>SIGN IN</u>
- <u>REGISTER</u>
  - ○

**Breaking News: Google shares down 4 percent in afternoon trading, extend premarket loss**

US | Thu Oct 15, 2015 1:54am EDT
Related: <u>U.S.</u>

# Colorado man gets probation for smuggling Chinese dinosaur fossils

**DENVER** | BY KEITH COFFMAN



A Chinese prehistoric dinosaur fossil is shown in this U.S. Immigration and Customs Enforcement (ICE) image released on October 14, 2015.

REUTERS/U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE)/HANDOUT

A Colorado fossil dealer has been sentenced to one year of probation after pleading guilty to charges related to his role in smuggling more than $570,000 worth of Chinese prehistoric dinosaur artifacts into the United States, federal authorities said on Wednesday.

Charles Magovern of Boulder, Colorado, was charged in July by U.S. prosecutors in Wyoming with illegally importing fossils – some dating back 151 million years – to sell to dealers or collectors, U.S. Immigration and Customs Enforcement (ICE) said in a statement.

Magovern, 67, conspired to sell Chinese fossils in retail stores or galleries in Vail, Colorado, and Jackson, Wyoming, said Walter Moran, assistant special-agent-in-charge for ICE's Homeland Security Investigations.

He possessed fossils from several prehistoric creatures, including micro-raptors and a protoceratops, a horned dinosaur that was valued at $250,000, ICE officials said.

In all, he played a role in smuggling more than $570,000 worth of Chinese dinosaur artifacts, officials said.

Moran said Magovern was caught as part of a conspiracy investigation that is ongoing and involves the illegal pilfering of fossils in Mongolia and China that later showed up for sale in galleries or auctions.

Magovern made false declarations to customs officials about the value of imported paleontological specimens and mislabeled the items or concealed them with legitimate cargo, authorities said.

Under a plea agreement, he pleaded guilty to making false statements to customs officials as well as aiding and abetting two other people in the conspiracy, and he returned the illegal items in exchange for a sentence of probation instead of prison time, court documents showed.

Chief U.S. District Court Judge Nancy Freudenthal, the top federal judge in Wyoming, sentenced Magovern last week to one year of supervised probation, court documents stated.

Magovern is the second defendant to plead guilty in the fossil-smuggling ring investigation, which Moran said began in 2012 following a tip to authorities from a member of the public.

Last year, John Rolater, one of the men that Magovern aided and abetted, was sentenced to two years of probation and fined $25,000 for offering to sell the illegal items in his Colorado and Wyoming galleries, said John Powell, spokesman for the U.S. Attorney's Office for the District of Wyoming.

Rolater conspired with his Chinese supplier to package "vertebrate fossils in a manner to subvert both Chinese and United States customs and import regulations," prosecutors said in court papers.

"Not only is the violation of customs laws, but the illegal extraction of these items takes away from the scientific record," Moran said.

(Editing by Alex Dobuzinskis and Sandra Maler)

FILED

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

U.S. DISTRICT COURT
DISTRICT OF WYOMING

2015 OCT 7 AM 8 09

UNITED STATES OF AMERICA

vs

CHARLES MAGOVERN

STEPHAN HARRIS, CLERK

Case Number: 15-CR-127¢1 CHEYENNE

Defendant's Attorney(s):
Kevin McGreevy

## JUDGMENT IN A CRIMINAL CASE

THE DEFENDANT pled guilty to count 1.

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title and Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. 542 and 2 | Entry of Goods by Means of False Statement and Aiding and Abetting | 06/30/2010 | 1 |

The defendant is sentenced as provided in pages 2 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of residence or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

Defendant's USM No: **14245-091**

October 6, 2015
Date of Imposition of Sentence

Nancy D. Freudenthal
Chief United States District Judge

October 6, 2015
Date

# PROBATION

The defendant is hereby placed on supervised probation for a term of one (1) year.

While on probation, the defendant shall not commit another Federal, state, or local crime.

While on probation, the defendant shall not illegally possess a controlled substance.
Revocation of probation is mandatory for possession of a controlled substance. The defendant
shall submit to one drug test within 15 days of release from imprisonment and at least two
periodic drug tests thereafter, as directed by the U.S. Probation Officer.

Pursuant to Public Law 108-405, Revised DNA Collection Requirements Under the Justice for
All Act of 2004, the defendant shall submit to DNA collection while incarcerated in the Bureau
of Prisons, or at the direction of the U.S. Probation Office.

While on probation, the defendant shall not use or possess a firearm, ammunition, dangerous
weapons or destructive device. Probation shall be revoked for possession of a firearm.

The defendant shall make special assessment and restitution payments as ordered by the Court
and is required to notify the Court, through the Probation Office, of any material change in the
defendant's economic circumstances that might affect the defendant's ability to meet these
monetary obligations.

The defendant shall comply with the standard conditions that have been adopted by this court
(set forth on the following page). The defendant shall also comply with the following
additional conditions:

The defendant shall provide full financial disclosure to the U.S. Probation Officer, including
detailed documentation of income and expenses.

The defendant shall cooperate with the Internal Revenue Service and file tax returns timely and
lawfully, and pay any back taxes, penalties and interest as determined by the Internal Revenue
Service.

The defendant shall submit his person, residence, storage facility, office or vehicle to a search,
conducted by a U.S. Probation Officer at a reasonable time and in a reasonable manner, based
upon reasonable suspicion of contraband or evidence of a violation of a condition; failure to
submit to a search may be grounds for revocation; the defendant shall warn any other residents
that the premises may be subject to searches pursuant to this condition.

The defendant shall submit to drug testing as directed by the Probation Officer and shall comply
with specific copays imposed pursuant to district policy for failing to comply with drug testing.

As a component of the defendant's testing program, the defendant shall pay a one time fee of
$250.00 to partially defray the costs of treatment and/or drug testing. Monetary payments made

---

15-CR-127-1F
CHARLES MAGOVERN

JUDGMENT IN A CRIMINAL CASE
PAGE 2 OF 6

by the defendant shall be applied to this fee only after all other court-ordered monetary obligations have been fulfilled. payment of the fee shall be made by money order or cashier's check to the Clerk of District Court, 2120 Capitol Avenue, Room 2131, Cheyenne, Wyoming 82001, utilizing the payment coupon provided by the probation office. This condition is waived if he is supervised by any District other than Wyoming.

The defendant shall submit travel itineraries for national and international travel to the U.S. Probation Office at least thirty days prior to travel, when the schedule is known, and the defendant has approval from the Court for international travel without seeking permission for each trip, with discretion through the U.S. Probation Office.

# STANDARD CONDITIONS OF SUPERVISION

1. The defendant shall not leave the judicial district without the permission of the Court or United States Probation Officer;

2. The defendant shall report to the United States Probation Officer in a manner and frequency directed by the Court or United States Probation Officer;

3. The defendant shall answer truthfully all inquiries by the United States Probation Officer and follow the instructions of the United States Probation Officer;

4. The defendant shall support his or her dependents and meet other family responsibilities;

5. The defendant shall work regularly at a lawful occupation unless excused by the United States Probation Officer for schooling, training or other acceptable reasons;

6. The defendant shall notify the United States Probation Officer at least 10 days prior to any change in residence or employment;

7. The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;

8. The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9. The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the United States Probation Officer;

10. The defendant shall permit a United States Probation Officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the United States Probation Officer;

11. The defendant shall notify the United States Probation Officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the Court;

13. As directed by the United States Probation Officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the United States Probation Officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

# FINANCIAL PENALTIES

The defendant shall pay the following total financial penalties in accordance with the schedule of payments set out below.

| Count | Assessment | Restitution | Fine |
|-------|-----------|-------------|------|
| 1 Notes: | $100.00 | $0.00 | $0.00 |
| Totals: | $100.00 | $0.00 | $0.00 |

# FINE AND/OR RESTITUTION

The fine and/or restitution includes any costs of incarceration and/or supervision. The restitution, which is due immediately, is inclusive of all penalties and interest, if applicable.

The defendant shall pay interest on any fine and/or restitution of more than Two Thousand Five Hundred Dollars ($2,500.00), unless the fine and/or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the below payment options are subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment; (2) restitution; (3) fine principal; (4) cost of prosecution; (5) interest; (6) penalties.

The total fine and other monetary penalties shall be due in full immediately.

The defendant shall pay all financial obligations immediately.  Any amount not paid immediately shall be paid commencing 60 days from today, in monthly payments of not less than $25, or 10% of the defendant's gross monthly income, whichever is greater.  All monetary payments shall be satisfied not less than 60 days prior to the expiration of the term of supervised probation.

Payments for monetary obligations shall be made payable by check or money order to the Clerk, U.S. District Court, 2120 Capitol Avenue, Room 2131, Cheyenne, WY 82001, and shall reference the defendant's case number, 15-CR-127-1F.

---

## MONETARY OBLIGATIONS / FORFEIT PROPERTY

The Defendant shall forfeit the following property:

  certain fossils already provided by the defendant  and in the custody of the office of Immigration, Customs and Homeland Security.

---

# EXHIBIT
# 7

Subscribe free to our newsletters via your Email Address |    ☑ SPACE DAILY ☐ SPACE WAR [Subscribe]



SPACE WAR    TERRADAILY    ENERGY DAILY    MARS DAILY    SOLAR DAILY    SPACE MART    GPS DAILY    SPACE TRAVEL    ROBO DAILY



STAPLES — Order today. — SHOP NOW — more FOR LESS

# SPACE DAILY
### your portal to space



6X MORE POWER

i pac cleans tough food better than 6 of the national bargain brand combined

Get Coupon

Cascade PLATINUM.

☐ AdChoices ▶   ▶ Chinese Web   ▶ Chinese New   ▶ Chinese Law   ▶ Fossil

CIVIL NUCLEAR

## Australian Pleads Guilty To Smuggling Chinese Dinosaur Eggs Into US

by Staff Writers
Los Angeles (AFP) Mar 16, 2006

An Australian mineral dealer pleaded guilty Wednesday to smuggling fossilized dinosaur eggs from China to the United states, authorities said. Tamas "Thomas" Kapitany, 45, is to be spend a year on criminal probation and pay a 20,000-dollar fine in a plea bargain made to avoid trial, according to Tammy Wilson of US Immigration and Customs Enforcement (ICE).



File photo: A dinosaur egg.

Kapitany, operator of Crystal World in Melbourne, also agreed to forfeit fossils seized by US investigators, Wilson said.

"These prehistoric treasures rightfully belong to China and the Chinese people," said David Nehls, assistant special agent in charge for ICE investigations at Los Angeles International Airport.

"It is shameful that someone would plunder specimens like this from another nation simply to pleasure hobbyists and line their own pockets."

US officials will coordinate with Chinese authorities to determine what to do with the fossils, according to ICE.

Starting as far back as 1999, Kapitany snuck eggs, which are deemed protected relics under Chinese law, from eastern China to California by mislabeling them minerals or geological specimens, prosecutors said.

Kapitany smuggled the eggs in through airports in the southern California cities of Los Angeles and San Diego, according to Wilson. Federal agents seized more than 140 boxes of smuggled eggs from a warehouse in the city of El Cajon.

The plea came just weeks after ICE agents raided a gem and fossil show in Tucson, Arizona, and confiscated almost eight tons of rare fossils including dinosaur eggs and prehistoric pinecones evidently smuggled out of Argentina.

The fossils were being sold by Argentina-based vendor Rhodo Company. That ICE investigation is ongoing and no arrests were made as of Wednesday.

Source: Agence France-Presse

Related Links

Subscribe free to our newsletters via your Email Address

☑ SPACE DAILY
☐ SPACE WAR
☐ TERRA DAILY
☐ ENERGY NEWS
☐ MARS DAILY
☐ GPS DAILY
☐ SEED DAILY
☐ WIND DAILY
☐ DISASTER NEWS
☐ SOLAR ENERGY
☐ MEDICAL NEWS
☐ NUCLEAR NEWS
☐ OIL & GAS NEWS
☐ BIO FUEL DAILY
[Subscribe]



BIRCH LANE
an INSPIRED fresh STAR

SHOP NOW

**United States District Court**　　　　　**SEND**
**Central District of California**

**UNITED STATES OF AMERICA** vs　　　　Docket No. __CR 06-184 FMO__

**Defendant** __Tamas Kapitany__

| | |
|---|---|
| **JUDGMENT AND COMMITMENT ORDER** | CLERK. U.S. DISTRICT COURT |

In the presence of the attorney for the government,  the defendant appeared in person, on this date

of : __March 15, 2006__　　　　　　　　　　　MAR 1 7 2006

CENTRAL DISTRICT OF CALIFORNIA
BY　　　　　　DEPUTY

**COUNSEL:** __X__ **WITH COUNSEL** __Harland W. Braun (retained)__

**PLEA:** __X__ **GUILTY**

**OFFENSE:** Concealing Country of Origin of Imported Articles in violation of 19 U.S.C. §§ 1304(a)(3)(D), (b), and (k)(1); and Causing an Act to be Done in violation of 18 U.S.C. § 2(b), as charged in the one-count Information.

**FINDINGS:**
The Court finds that the defendant is fully competent to plead guilty to the charge alleged in the information of violating 19 U.S.C. §§ 1304(a)(3)(D), (b), and (k)(1), and 18 U.S.C. § 2(b); and that defendant's plea of guilty: (a) has a factual basis; (b) is freely given, without any coercive influence of any kind; (c) is voluntarily made with the defendant's full knowledge of the nature of the charge against him and the consequences of his guilty plea; and (d) is made without the defendant having been induced by any promises of any kind made to him by anyone, or by any threats or coercion exerted upon him in any manner.

**JUDGMENT AND COMMITMENT ORDER:**
The defendant is adjudged GUILTY and convicted of the offense of Concealing Country of Origin of Imported Articles in violation of 19 U.S.C. §§ 1304(a)(3)(D), (b), and (k)(1); and Causing an Act to be Done in violation of 18 U.S.C. § 2(b), as charged in the one-count Information. In accordance with the terms of the written plea agreement filed March 8, 2006, the Court sentences the defendant as follows:

　　　Defendant is sentenced to one year Probation. It is ordered that the Defendant shall pay to the United States a special assessment of $50.00, which is due immediately. It is ordered that the Defendant shall pay to the United States a fine of $20,000.00. The fine shall be paid within 30 days of this judgment. The court orders bond exonerated and the return of defendant's passport. It is further ordered that the Waiver of Forfeiture and the Written Plea Agreement be incorporated in the record.

**DATED:** __3-15-06__　　　　　　　　　　　__F___ n. M___
　　　　　　　　　　　　　　　　　　　**U. S. Magistrate Judge**

It is ordered that the Clerk deliver a  copy of this Judgment and Commitment Order to the U.S. Marshal or other qualified officer.
　　　　　　　　　　　　　　　　　Sherri R. C_____

**Dated/Filed** __3-15-06__　　　　　**By** _____
**Month / Day / Year**　　　　　　　**Deputy Clerk**